J-S07002-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN THE INTEREST OF: J.F., A MINOR

APPEAL OF: I.B., FATHER

: IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
:
:
:
:
:
:
:
: No. 1137 WDA 2021

Appeal from the Order Entered September 8, 2021
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000066-2021

BEFORE: OLSON, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY OLSON, J.:            **FILED: May 11, 2022**

     I.B. (Father) appeals from the order entered on September 8, 2021, which terminated involuntarily his parental rights to his daughter, J.F. (Child). After review, we affirm the order.

     Child was born in Alaska in January 2010. S.F. (Mother) and Father never married nor had an ongoing relationship. Child never lived with Father and he was largely absent from her life. In 2011, an Alaskan court determined Father's paternity through default in a child support matter. N.T., 8/27/21, at Exhibit 6.

     During Father's absence from her life, Child has had a tumultuous experience in Mother's care. From the time Child was almost two until she was almost four, a child protective services agency in Alaska was involved

_____

[*] Retired Senior Judge assigned to the Superior Court.

with Mother due to concerns of domestic violence and prostitution while Child was present. N.T., 8/27/21, at 68. There were also allegations that Child was physically abused. *Id.*

At some point that is unclear from the record, Mother and Child relocated to Pennsylvania. When Child was five years old, the Office of Children, Youth, and Families (CYF) in Allegheny County, Pennsylvania, opened a case due to Mother's substance abuse and intimate partner violence between Mother and her paramour, R.G. N.T., 8/27/21, at 69. While CYF was working with the family, Child, Mother, and Child's one-year-old half-sibling, F.F., experienced a traumatic incident at the hands of R.G. Specifically, R.G. abducted Mother, held her against her will for three days, and raped Mother while Child and F.F. were in the home. *Id.* Although Mother obtained a protection from abuse order against R.G., she then permitted him to see her and the children, culminating in an incident where R.G. severely assaulted one-year-old F.F. and Mother delayed obtaining treatment for F.F. to protect R.G. *Id.* at 69-70, Exhibit 6.

On November 8, 2015, CYF obtained custody of Child and F.F. and removed them from Mother's care. *Id.* at 70. At that time, CYF conducted a diligent search to locate Father. *Id.* As CYF caseworker Justine Walz later explained at the termination of parental rights hearing, such a search entails researching social media, contacting local authorities and the post office, and attempting to engage the child's other parent. *Id.* at 100. The agency then

sends letters to any potential addresses and calls any potential phone numbers. *Id.* After its November 2015 diligent search, the agency located one potential address for Father in Anchorage, Alaska on N.P. Street, but the agency was unsuccessful in making contact with Father at that time. *Id.* at 70-71.

Meanwhile, due to Mother's issues and Father's absence, on February 17, 2016, the juvenile court adjudicated Child dependent pursuant to the Juvenile Act, 42 Pa.C.S. § 6302(1). The court also adjudicated F.F. dependent. After Child's second maternal half-sibling, S.F., was born in May 2016, the court also adjudicated him dependent. After approximately two and one-half years in foster care, Child reunified with Mother. On June 25, 2018, the juvenile court discharged the dependency cases of Child and her half-siblings.

By the end of 2018, however, the family was struggling. CYF re-opened services in December 2018 because Mother was neglecting her own mental health and neglecting the children's needs. N.T., 8/27/21, at 72-73. CYF learned Mother had discontinued Child's mental health treatment and Child was habitually truant from school. *Id.*

On September 11, 2019, the Juvenile Court adjudicated Child and her half-siblings dependent a second time. N.T., 8/27/21, at 75. At that time, CYF conducted another diligent search for Father. *Id.* at 76. They found five potential addresses for Father, all of which were in Anchorage, Alaska: N.

Street, M. Court, E. Street, N.B. Street. and N.P. Street. *Id.* CYF attempted to contact him at the potential addresses and phone numbers they found, but the agency still was unable to make contact. *Id.* at 76.

According to Ms. Walz, CYF conducted two more diligent searches for Father in April and September of 2020. *Id.* at 100. Ms. Walz also testified that CYF periodically conducted Accurint searches, which is a compilation of anyone associated with the parent who might have information on the parent's whereabouts: relatives, family members, known associates, neighbors, friends, etc. *Id.* CYF also assigned a "father engagement specialist" who attempted to contact Father's various relatives, mail letters to potential addresses, and call potential phone numbers. *Id.* at 101-102. Through these efforts, CYF located two more potential addresses for Father in Anchorage, Alaska, this time on F. Street. and Pr. Street. *Id.* at 101.

The first time CYF heard from Father was in June 2020. *Id.* Father left a message with front desk staff and provided two phone numbers. *Id.* CYF attempted to return Father's telephone call, but the phone numbers he provided did not work. *Id.* at 102. In November 2020, Ms. Walz received a call from Father's wife. Father's wife provided the couple's phone number and address in Alaska, which matched the Pr. Street address CYF located through its earlier diligent searches. *Id.* Armed with the information from Father's wife, Ms. Walz learned that CYF had the wrong area code for the numbers Father left in his June 2020 message. *Id.* at 117-18. Additionally, Father's

wife suggested that perhaps Father was difficult to locate because she and Father had moved to Florida on two occasions. *Id.* As Ms. Walz recounted, Father's wife told Ms. Walz that Father started getting CYF's mail around July of 2020. *Id.*

Following Ms. Walz's conversation with Father's wife, CYF continued to contact Father and his wife at the Pr. Street address, back-up address, phone numbers and email address she provided, but neither Father nor his wife responded. *Id.* at 103. Ms. Walz texted the phone number Father had provided in June 2020, now complete with the correct area code as confirmed by Father's wife in November 2020. *Id.* at 145. She also called that number multiple times, but Father's mailbox was full or not set up for voicemail. *Id.*

On March 31, 2021, CYF filed a petition to terminate involuntarily Father's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). In the petition, CYF listed the Pr. Street address. However, CYF's process server located Father at a different address on M. Road in Anchorage, Alaska, and served him with the petition personally on May 23, 2021. Affidavit of Service, 6/15/21; *see also* N.T., 8/27/21, at 160.

In June 2021, Father contacted CYF and spoke to Ms. Walz for the first time. N.T., 8/27/21, at 160. After that, he attended one permanency review hearing on July 28, 2021. *Id.* at Exhibit 6. He joined the virtual hearing an hour late. *Id.* Following the hearing, Father and Child had a fifteen-minute

virtual visit. This was the only contact Father and Child had during either of Child's dependency cases. *Id.* at 169.

The hearing on CYF's petition occurred on August 27, 2021.[1] At the time of the hearing, Child was eleven years old. Both Father and Child were present and represented by their own respective court-appointed counsel.[2] As it relates to Father's case, CYF presented the testimony of its caseworker, Ms. Walz. In addition to the information described *supra*, Ms. Walz testified that Child has been in sixteen different placements throughout her two dependency cases. N.T., 8/27/21, at 104. Her current placement is with a foster family who is not pre-adoptive but is committed to Child "long-term" until CYF transitions Child elsewhere.[3] *Id.* at 134. She had been there about six weeks at the time of the hearing. *Id.* Ms. Walz opined that it was in Child's best

_____

[1] During J.F.'s dependency matter, the juvenile court determined J.F. is an Indian child pursuant to the Indian Child Welfare Act (ICWA), 25 U.S.C. § 1901 – 1963. N.T., 8/27/21, at Exhibit 6. The parties agreed that CYF notified the tribe of J.F.'s removal from parental care, its filing of the petition to terminate parental rights, and of all court hearings in accordance with ICWA. N.T., 8/27/21, at 65. Although the tribe participated in a status conference, it did not seek to intervene. *Id.* at 66.

[2] Child's counsel was Eli Zlokas, Esquire. The trial court appointed him as Child's legal counsel in the termination matter on April 23, 2021 in accordance with 23 Pa.C.S. § 2313(a). Attorney Zlokas also represented Child as legal counsel in her dependency case since July 31, 2019. Child had a court-appointed guardian *ad litem* in the dependency matter, but only Attorney Zlokas participated in the termination matter.

[3] Ms. Walz did not elaborate on what CYF's plan was for Child.

interest for Mother's parental rights to be terminated because Mother is the source of Child's trauma and Child acts like a parent to Mother, but Ms. Walz did not offer an opinion regarding the effect upon Child in terminating Father's parental rights. *Id.* at 110-11, 134-35.

CYF also offered the testimony of Sarah Ulish, placement services manager at Auberle, a non-profit social services agency. Ms. Ulish provided some context for Child's number of placements and mental health difficulties during the period when Ms. Ulish supervised the case. *Id.* at 17-60. Finally, CYF introduced various exhibits,[4] including orders from Child's dependency matter and psychological examinations conducted of Child in 2016 and 2021. *See* N.T., 8/27/21, at Exhibits 6, 11-13. Of note, Dr. Neil Rosenblum, Ph.D., a court-appointed evaluator, diagnosed Child with various mental health conditions, including post-traumatic stress disorder. *Id.* at Exhibit 11-13. Child told Dr. Rosenblum she had four fathers, including Mother's various boyfriends and "Donor" in Alaska (presumably referring to Father in the manner Mother did). *Id.* Otherwise, Child did not mention Father.

Father, Mother, and Child testified in opposition to CYF's petition. During his testimony, Father claimed the first time he received any paperwork

---

[4] The notes of transcript indicate the parties entered into joint written stipulations. N.T., 8/27/21, at 62. The stipulations do not appear in the certified record. The trial court in its Rule 1925(a) opinion and the parties in their briefs refer to the stipulations to establish procedural history, but none of the arguments concern the stipulations. Accordingly, their absence does not impede our appellate review.

from CYF was when "this guy walked up to [him] directly right here at the trailer and handed [him] some paperwork." N.T., 8/27/21, at 160. He estimated this was early June 2021. *Id.* at 160-61, 174-75. He denied receiving paperwork from CYF at any other time. *Id.* at 167.

Father provided his current address, which matched the M. Road address where the process server located him to serve him with the petition seeking to terminate his parental rights. *Id.* at 160. When asked how long he lived there, Father responded, "[a]bout a year, almost two years now." Father first could not recall if his address before M. Road was F. Street or Pr. Street, but then agreed with his lawyer that he "kind of" lived on Pr. Street, stating "I was on and off." *Id.* at 162. When asked if it were in 2020 as CYF believed, Father responded, "So I want to say it was sometime in '19," because before he lived at his current M. Road address, Father lived "off of Pa[.] Street" at the house of his "buddy." *Id.* at 162, 166. Father did not know his buddy's address because he was "basically couch surfing" while he was having issues with his marriage. *Id.* at 166.

As far as other addresses CYF found for Father, he acknowledged living on F. Street, but qualified his testimony by saying he "barely lived there" and he could not recall the dates, just that he and his wife "had been going through basically a transition period." *Id.* at 162-63. He acknowledged living on N.P. Street "a couple of times," possibly "in like 2016." *Id.* at 164. He also acknowledged living on three other streets CYF found, but claimed those

addresses long predated Child's birth. *Id.* at 165. Other than the addresses found by CYF, he testified about four years ago, he lived in Hillsboro, Florida "for a little bit." *Id.* at 166.

By the time of the hearing, Father was divorced from his wife. Father denied knowing that his ex-wife had reached out to CYF in November 2020. *Id.* at 167. He claimed his ex-wife never told him CYF had an open case with Child. *Id.* He denied receiving a call from Ms. Walz in November 2020, or from anyone at CYF prior to receiving the petition to terminate his parental rights. *Id.* He maintained that no one from CYF contacted him to set up telephone calls with Child after they had a video visit after the July 28, 2021 permanency review hearing. *Id.* at 169-70.

After talking to Child, Father believes he and she "have so much in common" and he has been through similar things as her. *Id.* at 169-70. He wants to be Child's full-time primary caregiver, saying, "I want my chance." *Id.* at 170. In Father's view, "[s]he needs to know that I love her. And she also needs to be nourished." *Id.* He testified that he owned three trailers, he had room for Child, and he was ready and able to parent her. *Id.* at 169. Father asserted he has the resources to take care of Child and can offer her family on both sides and insurance coverage in Alaska to obtain mental health services. *Id.* at 170, 173. As he put it, "all I can do is show here [*sic*] what I was supposed to do a long time ago but I wasn't given the chance. No offense. And that's love my child and be a father to my child." *Id.* at 171.

Father felt "bamboozled" that CYF could not find him prior to filing the petition to terminate his rights. *Id.* at 172.

During cross-examination, Father admitted that he has known Child was his child her whole life. *Id.* at 175. According to him, he met her "one time when she was like two years old with her mom. And then poof, disappeared, nothing."[5] *Id.* at 175. One other unspecified time he saw Mother in a vehicle and they talked. *Id.* He claimed he did not know Child and Mother were in Pennsylvania. *Id.* at 176. When asked what he has done to try to locate Child, Father responded that he "tried at the beginning" with "[s]ocial media, stuff like that," but he was "not very savvy with computer stuff" and was "unsuccessful." *Id.* Father was aware he was paying child support for Child "for a while" because the state of Alaska garnishes his employment checks any time he worked, but Child was not his only child and "[a]ll I know I give them a payment and they divide it on however they do it." *Id.* at 175.

When asked about his lone call to CYF prior to receiving the petition to terminate his rights, Father recalled that his ex-wife "gave him a number or something" because his ex-wife did not think Child was Father's. *Id.* at 177.

_____

[5] Mother testified Father "has been absent" in Child's life. N.T., 8/27/21, at 192. According to Mother, "[w]e accidentally seen him like three times since she been born every [*sic*] since she was little. I was pushing a stroller and I seen him. **She** would always give me the wrong number and I would not be able to find him. So I never took that right away from him." *Id.* (emphasis added). It is unclear whether "she" is a typographical error in the notes of transcript or refers to someone other than Father. *Id.*

He called someone about Child, but no one called him back. *Id.* at 177. He claimed he did not know he was calling CYF or that it was in Pennsylvania, and he does not remember when he called. *Id.* at 176-78.

Finally, Child testified briefly. She explained that she wanted to return home to Mother and for Mother to retain her parental rights. *Id.* at 201. Regarding Father, Child testified she wanted more contact with him and to get to know him. *Id.* at 202.

By order dated August 27, 2021, and entered on September 8, 2021, the trial court terminated Father's parental rights involuntarily pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b).[6] On September 27, 2021, Father filed a notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On November 29, 2021, the trial court filed its Rule 1925(a) opinion.

On appeal, Father presents two issues for our review:

1. Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S.[A.] § 2511(a)(1)[,] (2)[,] (5)[,] and (8)?

2. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear

---

[6] By the same order, the trial court terminated the parental rights of any unknown father pursuant to § 2511(a)(1), (2), (5), (8), and (b). The trial court entered a separate order the same day that denied in part CYF's petition to terminate Mother's parental rights. Specifically, the court found that CYF met its burden of proving grounds under subsection 2511(a), but it did not prove by clear and convincing evidence that termination of Mother's parental rights served Child's needs and welfare under subsection 2511(b).

and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of the child pursuant to 23 Pa.C.S.[A.] § 2511(b)?

Father's Brief at 6 (suggested answers omitted).

We review these issues mindful of our well-settled standard of review. "In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, appellate courts must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

"[A]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion" or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, 256 A.3d at 1123-24.

- 12 -

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental "right to make decisions concerning the care, custody, and control" of his or her child with the "child's essential needs for a parent's care, protection, and support." *In re Adoption of C.M.*, 255 A.3d at 358. Termination of parental rights has "significant and permanent consequences for both the parent and child." *In re Adoption of L.A.K.*, 265 A.3d at 591. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re Adoption of C.M.*, 255 A.3d at 359 (*quoting Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)).

Termination of parental rights is governed by Section 2511 of the Adoption Act. "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination." *In re Adoption of C.M.*, 255 A.3d at 359; *see also* 23 Pa.C.S. § 2511(a)(1)-(11). In evaluating whether the petitioner proved grounds under subsection 2511(a), the trial court must focus on the parent's conduct and avoid using a "balancing or best interest approach." *Interest of L.W.*, 267 A.3d 517, 524 n.6 (Pa. Super. 2021). If the trial court determines the petitioner established grounds for termination under subsection 2511(a) by clear and convincing evidence, the court then must assess the petition under

subsection 2511(b), which focuses on the child's needs and welfare. ***In re***

***T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).

In the instant case, the trial court relied upon subsections 2511(a)(1)

and (b),[7] which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> * * *
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

---

[7] The orphans' court also terminated Father's parental rights pursuant to subsection 2511(a)(2), (a)(5), and (a)(8). We need only agree with its decision as to any one subsection of subsection 2511(a) and subsection (b) in order to affirm the termination of parental rights. ***Interest of K.M.W.***, 238 A.3d 465 (Pa. Super. 2020) (*en banc*). Because we affirm the decree pursuant to subsection 2511(a)(1) and (b), we do not address Father's arguments concerning subsection 2511(a)(2), (a)(5), and (a)(8).

To prove subsection 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Adoption of B.G.S.*, 245 A.3d 700, 706-07 (Pa. Super. 2021) (citation omitted). As our Supreme Court recently explained,

> Parental duties are not defined in the Adoption Act, but our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life.

*L.A.K.*, 265 A.3d at 592 (citations and quotation marks omitted).

Trial courts should consider the entire history of the case and avoid applying the statutory six-month requirement mechanically. *C.M.*, 255 A.3d at 364. However, the General Assembly's emphasis on the six months immediately preceding the filing of the termination petition indicates this timeframe is the "most critical period for evaluation" of a parent's conduct. *L.A.K.*, 265 A.3d at 592.

"[T]he question of whether a parent has failed or refused to perform parental duties must be analyzed in relation to the particular circumstances of the case." *In re Burns*, 379 A.2d 535, 540 (Pa. 1977). To this end, if competent evidence establishes the statutory criteria under subsection

2511(a)(1), then trial courts must proceed to evaluate the totality of the circumstances "under three lines of inquiry: (1) the parent's explanation for his or her absence; (2) the post-abandonment contact between parent and child, including a parent's efforts to re-establish contact; and (3) consideration of the effect of termination of parental rights on the child pursuant to Subsection 2511(b)." *C.M.*, 255 A.3d at 365. In evaluating the parent's explanation, court should bear in mind that "[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." *Id.* at 364 (citations and quotation marks omitted).

In his brief, Father blames Mother for not keeping him informed about Child's whereabouts. Father's Brief at 14, 17-18. He also blames CYF, contending the agency did not make proper attempts to locate him. *Id.* at 14-16. Father questions the veracity of Ms. Walz's testimony, insinuating that the agency ignored him until it needed him to terminate his parental rights. *Id.* at 16. He assails the trial court for holding his lack of participation in Child's dependency against him, claiming there was no proof that CYF ever provided him with notice. *Id.* at 18-20. Father argues he should not be expected to perform the impossible when he did not know where Child was, and he did not know she was dependent. *Id.* In Father's view, the agency failed "to present evidence that he cannot and will not be able to parent his daughter." *Id.* at 21.

Father's argument misses the mark. Under subsection 2511(a)(1), the petitioner does not have to prove that a parent is unable to parent his child in the future; instead, it must prove a parent "has failed or refused to perform parental duties" during the relevant six-month period. **In re Burns**, 379 A.2d at 540. There is no doubt that CYF established by clear and convincing evidence that Father's conduct during the six months immediately prior to the filing of the petition to terminate his rights demonstrated a settled purpose of relinquishing a parenting claim to Child, as well as a failure or refusal to perform his parental duties. The relevant six-month period at issue was from September 30, 2020, to March 31, 2021. During that timeframe, Father was absent from Child's life. He had no contact with CYF, and he had no contact with Child.

Father was absent not just during the six-month period, but for Child's entire life. Father admitted he was fully aware that Child existed and he could be her father.[8] However, his only contact with her was the few chance encounters when Child was a young toddler and the fifteen-minute virtual call a month before the hearing. As the trial court put it, "[t]he extent of [F]ather's parenting . . . came in the form of child support." Trial Court Opinion,

_____

[8] While Father argues there "is absolutely no proof [he] knew he was definitely" Child's father, Father's Brief at 20, Pennsylvania law rejects the view that a father is relieved of parental duties simply because there is no confirmation of his parentage by paternity test. **See In re Z.S.W.**, 946 A.2d 726 (Pa. Super. 2008).

11/29/21, at 11. Even his payment of child support was marked with passivity; he paid it by garnishment. N.T., 8/27/21, at 175.

Father blamed his abandonment of Child on Mother's disappearance, yet Father did not parent Child even when they lived in the same town. He then claims he was unable to find Child because he was not Internet-savvy. However, the lack of detail in his testimony regarding any attempt to find Child suggests he made a half-hearted attempt, at best, and he offers no explanation of why he did not enlist the assistance of others to enforce or effectuate his custody and parenting rights.

He then blames CYF for not finding him, ignoring that his absence from Child's life pre-dated CYF's involvement by years. Even if CYF could have or should have done more to locate him sooner, CYF did not create the parental void in Child's life. *Accord In re D.C.D.*, 105 A.3d 662, 675 (Pa. 2014) (holding agency's failure to provide reasonable efforts to reunify parent and child does not necessarily prohibit trial court from granting agency's petition to terminate parental rights).

Furthermore, while his argument questioning how CYF managed to find him to serve the termination petition after years of unsuccessful searches is a valid one, his own testimony weakens this argument. By Father's admission, he has lived in at least six places during the last five years, and even he was

unable to put forth a coherent timeline of his whereabouts.[9]  The trial court was not convinced by his testimony, finding him not credible.  Trial Court Opinion, 11/29/21, at 9.  Despite admitting that he called CYF in June 2020, Father claimed not to know anything about who he called.  Moreover, he made no attempt to follow up when he did not get a return call.  Father's passivity simply was not enough.  *See In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) ("Although a parent is not required to perform the impossible, he must act affirmatively to maintain his relationship with his child, even in difficult circumstances."); *see also In re Adoption of B.G.S.*, 240 A.3d 658, 665 (Pa. Super. 2020) ("Even when a parent has no contact with a child for a period in excess of six months, our law does not require termination of his or her parental rights where that parent faced obstacles preventing contact with the child, **so long as the parent has made reasonable, good faith efforts to resist those obstacles**.") (emphasis added).

From the start, Father acquiesced in Mother's possession of sole parental responsibility for Child, including the attendant consequences which flowed from that arrangement.  His abandonment of Child meant that he was not there to assist when Mother struggled, Child endured trauma, and Child moved in and out of foster homes and mental health placements.  Father's

---

[9] Father's assertion that CYF put forth a less than diligent search effort falls flat in view of Father's testimony which substantiated his residence at many locations uncovered by the agency.

late entry into Child's life left him little time for post-abandonment contact. Upon these facts, we discern no abuse of discretion or error of law in the trial court's determination that CYF established grounds to terminate Father's parental rights under 2511(a)(1).

We turn now to subsection (b), which requires the court to "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). "The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." *T.S.M.*, 71 A.3d at 628 (citation and quotation marks omitted). Our Supreme Court has made clear that section 2511(b) requires the trial court to consider the nature and status of the bond between a parent and child. *In re E.M.*, 620 A.2d 481, 484-85 (Pa. 1993). It is reasonable to infer that no bond exists when there is no evidence suggesting the existence of one. *See In re K.Z.S.*, 946 A.2d 753, 762–63 (Pa. Super. 2008). To the extent there is a bond, the trial court must examine whether termination of parental rights will destroy a "necessary and beneficial relationship," thereby causing a child to suffer "extreme emotional consequences." *E.M.*, 620 A.2d at 484-85.

"While a parent's emotional bond with his or her child is a major aspect of the [s]ubsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." *In re M.M.*, 106 A.3d 114, 118 (Pa. Super. 2014).

"In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." *Id*. In determining needs and welfare, the court may properly consider the effect of the parent's conduct upon the child and consider "whether a parent is capable of providing for a child's safety and security or whether such needs can be better met by terminating a parent's parental rights." *Interest of L.W.*, 267 A.3d at 524.

Furthermore, our Supreme Court has stated, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

In the instant case, although Father sets forth a separate issue concerning subsection 2511(b), he does not include any argument addressing Child's needs and welfare. He simply argues that the trial court should not have reached subsection 2511(b) because it erred by finding grounds to terminate rights under subsection 2511(a). Father's Brief at 22-23.

Because we have concluded the trial court did not err by finding grounds to terminate Father's rights under subsection 2511(a)(1), the trial court's decision to conduct a needs and welfare analysis under subsection 2511(b) was necessary and proper. Father offers no argument why the trial court erred or abused its discretion in concluding that terminating his parental rights served Child's needs and welfare. We cannot act as Father's counsel and develop arguments for him.[10] *Commonwealth v. Gilliam*, 249 A.3d 257, 271 (Pa. Super. 2021). Our caselaw is clear that failure to develop an argument renders it waived. *See In re: M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa. Super. 2017).

Based upon what is before this Court, even if we did not deem Father's argument to be waived, we would conclude the trial court acted within its discretion in concluding terminating Father's parental rights serves Child's needs and welfare. Father concedes there is no bond, arguing that he was unable to develop a bond due to CYF's failure to locate Father. Father's Brief at 22. We have already rejected this contention for the reasons explained in our analysis of subsection 2511(a). Without a bond and nothing more than Child's hope for more contact and Father's promise to step up after eleven years, the trial court was within its discretion to conclude that Child would not

_____

[10] Furthermore, despite opposing CYF's petition, Child's counsel did not file an appeal on Child's behalf or file a brief in Father's appeal, leaving this Court without the benefit of advocacy on behalf of Child.

suffer extreme emotional consequences by terminating Father's parental rights. *See In re Adoption of J.M.*, 991 A.2d 321, 325 (Pa. Super. 2010) ("[Subs]ection 2511(b) requires the trial court to determine what effect breaking an existing parent-child bond will have on the child currently, not speculating whether a bond may be formed in the future."); *see also Z.P.,* 994 A.2d at 1121 ("A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights."). The trial court was fully aware that Child has experienced mental health difficulties and instability in foster care. *See* Trial Court Opinion, 11/29/21, at 13. Although not discussed by the trial court, we observe that Child was not in a pre-adoptive home and the court did not terminate Mother's parental rights at this time. Nevertheless, the court must evaluate parents' rights individually, *see In re C.W.U., Jr.,* 33 A.3d 1, 9 (Pa. Super. 2011), and "a pending adoption is not a prerequisite" to terminate rights in cases involving a child welfare agency. *In re T.S.M.*, 71 A.3d at 268 (citing 23 Pa.C.S. § 2512(b)). Our Supreme Court has instructed courts not to apply the law mechanically and instead consider a particular child's needs and welfare. *Id.* at 268-69. Given the trial court's familiarity with Child after overseeing her dependency and the support in the record for the trial court's decision, we defer to the trial court's assessment of Child's particular needs and welfare. *In re Adoption of S.P.*, 47 A.3d 817, 826–27 (Pa. 2012).

Based on the foregoing, we conclude the trial court did not err or abuse its discretion in terminating Father's parental rights. Accordingly, we affirm the order doing so.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/11/2022